**Case No. 25-616**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### IN RE: PETITION OF THE CENTER FOR INVESTIGATIVE REPORTING TO UNSEAL DOCKET AND JUDICIAL RECORDS:

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

### CENTER FOR INVESTIGATIVE REPORTING,

*Intervenor-Appellant,*

### IN THE MATTER OF THE APPLICATION OF THE UNITED STATES FOR AN ORDER AUTHORIZING THE INTERCEPTION OF W,

*Defendant.*

Appeal from United States District Court
Northern District of California
Hon. James Donato
U.S. District Court Case No. 3:95-xr-00344-JD

### BRIEF OF AMICUS CURIAE FIRST AMENDMENT COALITION IN SUPPORT OF INTERVENOR-APPELLANT AND REVERSAL

### FIRST AMENDMENT COALITION
David Loy
dloy@firstamendmentcoalition.org
Aaron Field
afield@firstamendmentcoalition.org
534 4th Street, Suite B
San Rafael, CA 94901-3334
415.460.5060

Attorneys for Amicus Curiae FIRST AMENDMENT COALITION

## CORPORATE DISCLOSURE STATEMENT AND

## STATEMENT OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 26.1(a), amicus curiae First Amendment Coalition states that is a nonprofit organization with no parent company.  It issues no stock and does not own any of the parties' stock.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus curiae First Amendment Coalition states that no party's counsel authored this brief in whole or in part; no party or party's counsel  contributed money intended to fund preparing or submitting this brief; and no person, other than amicus, its members, or counsel contributed money intended to fund the preparation or submission of this brief.

Dated: June 4, 2025

FIRST AMENDMENT COALITION

By _____ */s/ Aaron Field* _____
DAVID LOY
AARON FIELD
Attorneys for Amicus Curiae FIRST
AMENDMENT COALITION

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF
COMPLIANCE ...................................................................................1

INTEREST OF *AMICUS CURIAE*...........................................................1

INTRODUCTION ....................................................................................3

ARGUMENT ............................................................................................4

    I.     Public Access to Wiretap Application Materials Enables
          Meaningful Public Oversight of Federal Government
          Wiretapping, which is of Great Public Importance.............................4

    II.    The District Court Erred in Finding No Good Cause for Any
          Disclosure Here. ...............................................................................10

CONCLUSION.........................................................................................18

CERTIFICATE OF COMPLIANCE.......................................................19

i

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Becerra v. Superior Ct.*
44 Cal. App. 5th 897 (2020) .................................................................2

*Beckman Indus., Inc. v. Int'l Ins. Co.*
966 F.2d 470 (9th Cir. 1992) ...............................................................12

*Berger v. United States*
388 U.S. 41 (1967).................................................................................11

*Cal. First Amend. Coal. v. Woodford*
299 F.3d 868 (9th Cir. 2002) .................................................................2

*Califano v. Yamasaki*
442 U.S. 682 (1979)................................................................................4

*City of Gilroy v. Superior Ct.*
(Feb. 21, 2024, No. S282937) (Cal.) (pending).....................................2

*City of San Jose v. Superior Ct.*
2 Cal. 5th 608 (2017) ........................................................................1, 2

*Courthouse News Serv. v. Planet*
947 F.3d 581 (9th Cir. 2020) .................................................................2

*Cox Broad. Corp. v. Cohn*
420 U.S. 469 (1975)................................................................................5

*Ctr. for Investigative Reporting v. U.S. Dep't of Lab.*
No. 24-880 (9th Cir.) (pending)..............................................................2

*Father M. v. Various Tort Claimants (In re Roman Cath. Archbishop)*
661 F.3d 417, 427 (9th Cir. 2011) ............................................12, 13, 15

*First Amend. Coal. v. Superior Ct.*
98 Cal. App. 5th 593 (2023) ..................................................................2

ii

*First Amend. Coal. v. U.S. Dep't of Just.*
  869 F.3d 868 (9th Cir. 2017) ...............................................................2

*Food Mktg. Inst. v. Argus Leader Media*
  588 U.S. 427 (2019)......................................................................2, 11

*Garcia v. County of Alameda*
  No. 24-6814 (9th Cir. 2025) ...............................................................2

*Glenmede Trust Co. v. Thompson*
  56 F.3d 476 (3d Cir. 1995) ...................................................12, 13, 15

*Golden ADA, Inc. v. United States*
  934 F. Supp. 341 (N.D. Cal. 1996).......................................................3

*In re: Appl. of Media Coal. to Unseal Search Warrant Materials Pertaining
  to Warrant Nos. SW43684 and SW43687* (S.F. Cnty. Super. Ct.).......................9

*Katz v. United States*
  389 U.S. 347 (1967)..........................................................................10

*McClatchy Newspapers, Inc. v. Superior Ct.*
  189 Cal. App. 3d 961 (1987) ...............................................................5

*Nat'l Laws. Guild v. City of Hayward*
  9 Cal. 5th 488 (2020) .........................................................................2

*Pansy v. Borough of Stroudsburg*
  23 F. 3d 772 (3d Cir. 1994) ........................................................13, 15

*Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*
  307 F.3d 1206 (9th Cir. 2022) ....................................................12, 15

*Press Enterprise Co. v. Superior Court*
  478 U.S. 1 (1986)........................................................................5, 6, 7

*Press-Enterprise Co. v. Superior Ct.*
  464 U.S. 501 (1984)............................................................................1

*Richmond Newspapers, Inc. v. Va.*
  448 U.S. 555 (1980)............................................................................5

iii

*In re Roman Cath. Archbishop*
  661 F.3d at 424–25 ............................................................................12, 13, 16

*Shoen v. Shoen*
  5 F.3d 1289 (9th Cir. 1993) ...............................................................................7

*TRW Inc. v. Andrews*
  534 U.S. 19 (2001)............................................................................................11

*U.S. Dep't of Justice v. Tax Analysts*
  492 U.S. 136 (1989)..........................................................................................15

*United States v. LaRouche Campaign*
  841 F.2d 1176 (1st Cir. 1988)............................................................................7

**STATUTES**

18 U.S.C. §§ 2510 *et seq.*.....................................................................................*passim*

18 U.S.C. 2518(8)(b)..............................................................................................*passim*

18 U.S.C. § 2518(1) ...............................................................................................17

18 U.S.C. § 2518(4) ...............................................................................................17

42 U.S.C. § 2000aa .................................................................................................9

Cal. Penal Code § 1524(g) ......................................................................................9

**OTHER AUTHORITIES**

David Snyder & Ben Trefny, *FAC, SPJ NorCal Announce Efforts to Protect Press Freedom One Year After Raid on Journalist*, First Amend. Coal. (May 12, 2020), https://firstamendmentcoalition.org/news/post/fac-spj-norcal-announce-efforts-to-protect-press-freedom-one-year-after-raid-on-journalist/ ...............................................................................................................9

Federal Rules of Appellate Procedure
  26.1(a) ................................................................................................................1
  29(a)(2) ..............................................................................................................1
  29(a)(4)(E) .........................................................................................................1

Federal Rule of Civil Procedure 26(c).............................................................*passim*

iv

Morse & Zucker, *The Journalist's Privilege in Testimonial Privileges* (Stone & Liebman eds., 1983) 474–75 ....................................................................................7

*Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("Church Committee Report") Book II: Intelligence Activities and the Rights of Americans*, S Rep No 94-755 (1976)....................................................................................................6

Susan Freiwald, *Online Surveillance: Remembering the Lessons of the Wiretap Act*, 56 Ala. L. Rev. 9 (2004)..................................................................10

## INTEREST OF *AMICUS CURIAE*[1]

The First Amendment Coalition ("FAC") is a San Rafael, California-based nonprofit public interest organization dedicated to defending free speech, free press, and open government rights in order to make government, at all levels, accountable to the people. Its mission is based on the premise that "'Openness in government is essential to the functioning of a democracy.'" *City of San Jose v. Superior Ct.*, 2 Cal. 5th 608, 615 (2017) (quoting *Int'l Fed'n of Pro. & Tech'l Eng'rs v. Superior Ct,*, 42 Cal. 4th 319, 328–29 (2007)). *Accord. Press-Enterprise Co. v. Superior Ct.*, 464 U.S. 501, 509 (1984) ("'People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing.'") (quoting *Richmond Newspapers, Inc. v. Va.*, 448 U.S. 555, 572 (1980).)

FAC advances its mission by working to improve federal, state, and local governmental compliance with open government laws. Its activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to

---

[1] FAC has sought and obtained consent from the parties to file this brief and may therefore file it with the Court. Fed. R. App. Proc. 29(a)(2). This brief is timely pursuant to the Court's May 29, 2025 Order. *See* Dkt. No. 17.1 at 1-2 (granting unopposed motion to extend deadline to June 4, 2025).

government records and free speech, and public advocacy, including extensive trial and appellate litigation.

FAC regularly engages in direct litigation to protect and advance the rights of the public and the press to access judicial and law enforcement records and proceedings. *E.g.*, *First Amend. Coal. v. U.S. Dep't of Just.*, 869 F.3d 868 (9th Cir. 2017); *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002); *First Amend. Coal. v. Superior Ct.*, 98 Cal. App. 5th 593 (2023); *Becerra v. Superior Ct.*, 44 Cal. App. 5th 897 (2020); *see also, e.g.*, *Garcia v. County of Alameda*, No. 24-6814 (9th Cir. 2025) (pending FAC case challenging limitation on journalist's right to record in a public forum). It also regularly appears as amicus curiae in state and federal appellate government transparency cases. *E.g., City of Gilroy v. Superior Ct.* (Feb. 21, 2024, No. S282937) (Cal.) (pending); *Ctr. for Investigative Reporting v. U.S. Dep't of Lab.*, No. 24-880 (9th Cir.) (pending); *Nat'l Laws. Guild v. City of Hayward*, 9 Cal. 5th 488 (2020); *Courthouse News Serv. v. Planet*, 947 F.3d 581 (9th Cir. 2020); *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019); *City of San Jose v. Superior Ct.*, 2 Cal. 5th 608 (2017).

This case raises important access issues of first impression in this Circuit: when and to what extent can journalists and other members of the public access wiretap application materials under the Wiretap Act and the First Amendment where, as here, they relate to a long-closed investigation?  Given FAC's work and

2

mission, FAC and its members have a strong interest in ensuring that this issue is resolved in favor of access. Without access to wiretap application materials, meaningful public oversight of the government's exercise of its wiretap powers and an informed public assessment of whether those powers should be strengthened, weakened, or changed is not possible.

## INTRODUCTION

At stake in this case is not only the right of access to records for appellant The Center for Investigative Reporting ("CIR"),regarding Golden ADA, but also the public's ability to access to wiretap application proceedings more broadly and to thereby meaningfully oversee the federal government's exercise of its wiretapping authority. In the district court, CIR moved to unseal a small number of wiretap application records related to the federal government's long-closed criminal investigation of Golden ADA, a San Francisco-based diamond importing firm that has a history fraught with lawsuits, federal investigations, diamond conversion allegations, and international intrigue. Appellant's Opening Br. 7–8, Dkt. No. 11.1.[2] CIR's motion raised two primary questions that this Court has not

---

[2] CIR writes, "Three individuals, Andrei Kozlenok, Ashrot Shagirian, and David Shagirian, formed Golden ADA in October 1992 with the purpose of processing rough diamonds. [*Golden ADA, Inc. v. United States*, 934 F. Supp. 341, 343 (N.D. Cal. 1996).] According to Russian government allegations in court filings, these diamonds were shipped to Golden ADA to secure a line of credit on behalf of the Russian Federation rather than to be sold commercially. *Id.* at 342. But the individuals behind Golden ADA instead converted the diamonds and other

yet answered: when and to what extent does the press and the public have a right of access to federal wiretap application materials under the Wiretap Act and the First Amendment? FAC concurs that, for the reasons stated by appellant CIR, the district court's order should be reversed under both the Wiretap Act's "good cause" standard and the First Amendment right of access, although if this Court decides in CIR's favor on statutory grounds, it need not reach constitutional issues. *Califano v. Yamasaki*, 442 U.S. 682, 692 (1979) ("A court presented with both statutory and constitutional grounds to support the relief requested usually should pass on the statutory claim before considering the constitutional question.").

In the interest of brevity, FAC's amicus brief is addressed to the statutory interpretation question. For the reasons below, and the reasons stated by appellant CIR, the district court's order holding that CIR had not shown good cause to unseal any of the records at issue here, even in part, should be reversed.

## ARGUMENT

**I. PUBLIC ACCESS TO WIRETAP APPLICATION MATERIALS ENABLES MEANINGFUL PUBLIC OVERSIGHT OF FEDERAL GOVERNMENT WIRETAPPING, WHICH IS OF GREAT PUBLIC IMPORTANCE.**

CIR's motion and access to wiretap application proceedings more broadly serve powerful public interests. As a general matter, openness in criminal

---

precious metals for themselves—in particular, 'for the purchase of luxury automobiles and yachts as well as residential and commercial property.' *Id.*; *see also* 2-ER-73." Appellant's Opening Br. 7, Dkt. No. 11.1.

proceedings allows the public to debate, evaluate, and oversee the work of law enforcement and the judicial branch in an informed way. *See Richmond Newspapers, Inc. v. Va.*, 448 U.S. 555, 587 (1980) [Brennan, J., Marshall, J., concurring]; *see also McClatchy Newspapers, Inc. v. Superior Ct.*, 189 Cal. App. 3d 961, 975 (1987) (the public's "interest in overseeing the conduct of the prosecutor, the police, and the judiciary is strong indeed"). The press plays a special role in facilitating informed debate, evaluation, and oversight:

> Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491–92 (1975). In criminal cases, openness also has "community therapeutic value." *Press Enterprise Co. v. Superior Court* ("*Press-Enterprise II*"), 478 U.S. 1, 13 (1986) (quotations removed). And, it ensures "the appearance of justice," which is "best provided for by allowing people to observe it." *Richmond Newspapers, Inc.*, 448 U.S. at 571–72 (quotations removed).

History teaches that robust and informed public oversight, which openness facilitates, is particularly important with respect to governmental wiretaps, which have a long record of abuse. In the 1970s, the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("the Church

5

Committee") conducted an extensive investigation into domestic surveillance in the United States. *Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("Church Committee Report") Book II: Intelligence Activities and the Rights of Americans*, S Rep No 94-755 (1976). The investigation involved 126 hearings, the examination of "some 800 witnesses," and "[a]pproximately 110,000 document pages." *Id.* at IX. The Church Committee found, among many other causes for concern, that:

> Since the early 1930s, intelligence agencies have frequently wiretapped and bugged American citizens without the benefit of judicial warrant. Recent court decisions have curtailed the use of these techniques against domestic targets. But past subjects of these surveillances have included a United States Congressman, a Congressional staff member, journalists and newsmen, and numerous individuals and groups who engaged in no criminal activity and who posed no genuine threat to the national security, such as two White House domestic affairs advisers and an anti-Vietnam War protest group. While the prior written approval of the Attorney General has been required for all warrantless wiretaps since 1940, the record is replete with instances where this requirement was ignored and the Attorney General gave only after-the-fact authorization.

*Id.* at 12. The Church Committee determined that, "Despite its stated value in foreign counterintelligence cases," "the dangers inherent in" the government's use of wiretapping and bugging as investigative tools "imply a clear need for rigorous controls." *Id.* at 198; *see also id.* at 198–201 (elaborating on instances of wiretapping and bugging).

The Church Committee noted that electronic surveillance "raises special problems when the targets are lawyers and journalists." *Id.* at 201. As to lawyers, the Committee noted that it can intrude into attorney-client privileged conversations. *Id.* As to journalists, the Committee recounted that, "[s]ince 1960," "at least six American journalists and newsmen" were "the targets of warrantless wiretaps or bugs." *Id.* It stated,

> These surveillances were all rationalized as necessary to discover the source of leaks of classified information, but, since wiretaps and bugs are indiscriminate in the types of information collected, some of these taps revealed the attitudes of various newsmen toward certain politicians and supplied advance notice of forthcoming newspaper and magazine articles dealing with administration policies. The collection of information such as this, and the precedent set by wiretapping of newsmen, generally, inevitably tends to undermine the constitutional guarantee of a free and independent press.

Wiretapping also imperils journalists' relationships with sources, including confidential sources, raising similar concerns to those that this Court has recognized are implicated by subpoenas targeting journalists and news media organizations. *See Shoen v. Shoen*, 5 F.3d 1289, 1295–96 (9th Cir. 1993) (discussing interests in protecting journalists against compelled disclosure and quoting, *inter alia*, *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) and Morse & Zucker, *The Journalist's Privilege in Testimonial Privileges* (Stone & Liebman eds., 1983) 474–75). The dangers wiretapping poses

7

to the news reporting process underscores the need for meaningful public oversight of the federal government's use of its wiretapping authority

The prevalence of sealing in cases under the Electronic Communications Privacy Act ("ECPA") confirms the public interest in openness in wiretapping application proceedings. In 2012, then-United States Magistrate Judge Stephen Smith estimated that in 2006 alone, "federal magistrate judges were presented with over 30,000 secret ECPA applications" (including wiretap applications) and added, "there is no reason to believe these numbers have abated in recent years; quite the contrary, in fact." *Gagged, Sealed & Delivered: Reforming ECPA's Secret Docket*, 6 Harv. L. & Pol'y Rev. 313, 322 (2012). He also noted the absence of meaningful guidance from federal appellate courts on ECPA issues due to excessive sealing – which the lack of Ninth Circuit authority on issues presented in this case also highlights. *Id.* at 321–22.

Although laws such as ECPA and the Wiretap Act were adopted to curb abuses of surveillance power, the ex parte nature of wiretap applications can increase the risk of error, which only strengthens the public interest in oversight. FAC's response to unlawful search warrants targeting a San Francisco journalist several years ago provides a recent illustration of the salutary effects of eventual access to records of search warrant and wiretap applications, including the ability to expose and address errors committed ex parte. In 2019, the San Francisco Police

Department sought and obtained five search warrants targeting San Francisco freelance journalist Bryan Carmody, despite the fact that, as each of the judges who issued the warrants eventually held, each warrant was clearly unlawful. *See* 42 U.S.C. § 2000aa; Cal. Penal Code § 1524(g). FAC — with the Northern California Chapter of the Society of Professional Journalists ("SPJ NorCal") and the Reporters Committee for Freedom of the Press ("RCFP") — moved for and won access to the SFPD's applications for the search warrants and the warrants themselves. *In re: Appl. of Media Coal. to Unseal Search Warrant Materials Pertaining to Warrant Nos. SW43684 and SW43687* (S.F. Cnty. Super. Ct.). These records shed important additional light on who knew what, when about Mr. Carmody's journalist status and why law enforcement policies and judicial oversight failed to prevent the unlawful warrants from issuing. *See* David Snyder & Ben Trefny, *FAC, SPJ NorCal Announce Efforts to Protect Press Freedom One Year After Raid on Journalist*, First Amend. Coal. (May 12, 2020)*, https://firstamendmentcoalition.org/news/post/fac-spj-norcal-announce-efforts-to-protect-press-freedom-one-year-after-raid-on-journalist/ ("The records showed that police failed to disclose to the judges that Carmody had a current SFPD-issued press credential. However, in two applications, officers disclosed details about Carmody's work in the news business, which should have prevented judges from

9

authorizing the warrants.").[3] That information, in turn, informed FAC's policy advocacy response. Public access to wiretap application materials, especially under the circumstances here, where the relevant investigation is closed, is of public importance and can serve the public interest in the same way that public access to search warrant materials in the Carmody case did.

## II. THE DISTRICT COURT ERRED IN FINDING NO GOOD CAUSE FOR ANY DISCLOSURE HERE.

The district court's blanket determination that CIR did not show "good cause," 18 U.S.C. § 2518(8)(b), for access to any of the wiretap application materials it asked for, even in part, should be reversed, because its order misinterpreted and misapplied the Wiretap Act's "good cause" standard for unsealing.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 , 18 U.S.C. §§ 2510 *et seq.* ("the Wiretap Act"), was enacted in 1968 and formally authorized federal government wiretapping while also placing strict limits on the practice. *See* Susan Freiwald, *Online Surveillance: Remembering the Lessons of the Wiretap Act*, 56 Ala. L. Rev. 9 (2004), at 23–26 (discussing genesis of the Wiretap Act and citing, *inter alia*, *Katz v. United States*, 389 U.S. 347, 353, 356–

---

[3] FAC's "case page" discussing the Carmody warrant materials, which contains links to the unsealed court records in the case, is available at https://firstamendmentcoalition.org/news/post/the-bryan-carmody-story-in-depth/.

10

57 (1967), and *Berger v. United States*, 388 U.S. 41, 64 (1967)). Relevant here, 18

U.S.C. section 2518(8)(b) provides:

> Applications made and orders granted under this chapter [] shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years.

The Act does not define "good cause," either in section 2518(8)(b) or

elsewhere.[4] *Cf. Food Mktg. Inst.*, 588 U.S. at 436 ("In statutory interpretation

disputes, a court's proper starting point lies in a careful examination of the

ordinary meaning and structure of the law itself."). And, as CIR states, Black's

Law Dictionary defined "good cause" as simply a "substantial reason, one that

affords a legal excuse" at the time that the Wiretap Act was written. Appellant's

Opening Br. 35, Dkt. No. 11.1 (citing *Good Cause*, Black's Law Dictionary (4th

ed. 1951)). Thus, to interpret what Congress meant by "good cause" in section

2518(8)(b), this Court can, and should, be guided by the well-established meaning

---

[4] The inclusion of a "good cause" disclosure provision in the statute and the use of the word "shall," however, do make plain that the definition of "good cause" must make access and disclosure at least possible. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal citation and quotation marks omitted).

11

of "good cause" in a prior, similar rule approved by Congress: Federal Rule of Civil Procedure 26(c).

The "good cause" standard for obtaining a protective order was codified in the federal rules by 1938, as CIR notes, three decades before the enactment of the Wiretap Act in 1968. Appellant's Opening Br. 35, Dkt. No. 11.1. And, section 2518(8)(b) and Rule 26(c) serve similar purposes, as both govern questions of disclosure and secrecy. This Court should draw on the established meaning of "good cause" in Rule 26(c) when interpreting "good cause" in the Wiretap Act.

Under Rule 26(c), whether there is "good cause" for a protective order turns on an analysis that "proceeds in three steps." *Father M. v. Various Tort Claimants* (*In re Roman Cath. Archbishop*), 661 F.3d 417, 427 (9th Cir. 2011). First, the proponent of nondisclosure must show that disclosure would cause particularized harm. *In re Roman Cath. Archbishop*), 661 F.3d at 424–25; *accord. Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2022); *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992).

Second, if the moving party makes this initial showing, the court must balance the "the public and private interests to decide whether [maintaining] a protective order is necessary." *Phillips*, 307 F.3d at 1211. In doing so, courts "consider the factors identified in *Glenmede Trust Co. v. Thompson*, 56 F.3d 476,

483 (3d Cir. 1995)." *In re Roman Cath. Archbishop*, 661 F.3d at 424. These factors are:

> (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.

*Glenmede Trust Co.*, 56 F.3d at 483; *see also Pansy v. Borough of Stroudsburg*, 23 F. 3d 772, 786 (3d Cir. 1994) ("The public's interest is particularly legitimate and important where … at least one of the parties to the action is a public entity or official.").

Third, even if the first two steps favor some nondisclosure, courts must consider the possibility of redacting or partially withholding some information and disclosing the remainder and should do so where appropriate. *In re Roman Cath. Archbishop*, 661 F.3d at 424–25.

This well-established "good cause" test should guide this Court's interpretation of "good cause" in section 2518(8)(b) and should be adapted for use in section 2518(8)(b) motions to unseal, with minor revision to assign a practicable initial burden to the proponent, rather than the opponent, of access. As with the

13

"good cause" analysis under Rule 26(c), the "good cause" analysis under section 2518(8)(b) should proceed in three steps:

First, given the language of the statute that requires a "showing" to support disclosure, 18 U.S.C. § 2518(8)(b), the moving party should bear an initial burden to show that there is an interest in disclosure. Because the moving party in a section 2518(b)(8) proceeding is advocating for disclosure rather than secrecy, the moving party should be required to show an interest in the outcome they are seeking, not, as under Rule 26(c), that disclosure would cause cognizable harm.

While this showing, similar to step one of the Rule 26(c) analysis, should be made with a reasonable level of specificity, the level of specificity required should be tempered by, and must be practicable in light of, the necessarily limited information available to the moving party. In most cases, the moving party will know little, if anything, about the content of the records at issue in its motion; indeed, if the docket is sealed, the moving party may not even know what records exist that would be responsive to a section 2518(b)(8) motion.

Nor should the moving party be required given its limited access to information—contrary to the district court in this case—to preemptively identify and overcome any privacy interests that might be implicated by disclosure. Those interests should be formally considered at steps two and three of the "good cause" analysis. The court should consider the parties' evidence and the contents of the

14

records in evaluating privacy interests rather than requiring the moving party to guess what those interests are and overcome them at the outset. *Cf. U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989) (noting that in Freedom of Information Act cases, "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought . . . have not been 'improperly' 'withheld,'" because "[p]lacing the burden of proof upon the agency puts the task of justifying the withholding on the only party able to explain it.") (citations omitted).

Second, as with Rule 26(c), courts should balance the "the public and private interests to decide whether [maintaining] a protective order is necessary." *Phillips*, 307 F.3d at 1211. In reviewing the totality of the circumstances during this balancing analysis, courts should consider the same factors that they do at step two of the Rule 26(c) analysis—which include "any privacy interests" in nondisclosure. *See In re Roman Cath. Archbishop*, 661 F.3d at 424 (citing *Glenmede Trust Co.*, 56 F.3d at 48).[5] Courts should also consider the public interest in access to records that speak to the conduct of public business by public officials and law enforcement officers. *See Pansy*, 23 F.3d at 786.

---

[5] Important among these interests is whether disclosure illuminates other "issues important to the public," *Glenmede Trust Co.*, 56 F.3d at 483, as CIR has explained disclosure would in this case.

Third, regardless of whether the first two steps indicate some information should be protected, courts should always consider whether any overriding interests in nondisclosure can be served by rather than withholding entire records, just as they must under Rule 26(c). *See In re Roman Cath. Archbishop*, 661 F.3d at 424–25. Even when some nondisclosure is permitted, partial disclosure should be favored over blanket nondisclosure, the district court's approach here, whenever reasonably possible. *See id.*

Applying this "good cause" standard, the district court's order should be reversed, and the records that CIR seeks should be disclosed, at least in part. As to the first step, CIR has shown that there is a public interest in access with more than enough specificity, especially given the limited information available about the contents of the records in this case. CIR made a tailored motion to unseal a small number of wiretap application records in a single case. Further, CIR supported its motion with a declaration, offered to provide additional evidence, and showed that the records at issue would shed further light on an investigation that is plainly newsworthy, historically significant, and likely to be informative regarding the relationship between the United States and Russia.

As to the second and third steps, a balancing of interests that considered the totality of the circumstances and the factors identified by this Court's Rule 26(c) cases, and a more serious and nuanced consideration of the possibility of disclosure

16

with redactions that gave appropriate weight to the possibility and importance of at least partial disclosure, should have resulted in the disclosure of at least some of the records sought in CIR's motion, especially given the undisputed fact that the underlying investigation is decades old and has long been closed. A review of the component parts of the records at issue here makes clear that district court's blanket denial of CIR's motion in this case was misplaced. The records CIR seeks include wiretap applications and orders under 18 U.S.C. § 2518(8)(b) (N.D. Cal. Dkt. Nos. 1–3, 7, 8, 10–12, 14) and filings related to "ten-day reports" and an inventory (N.D. Cal. Dkt. Nos. 4–6, 9, 13). Appellant's Opening Br. 16, Dkt. No. 11.1 (citing 2–ER–161–68); 18 U.S.C. §§ 2518(1), (4). For example, initial wiretap applications and orders presumably would not include any information that is the fruit of a wiretap and, in any event, applications must contain, among other items, an enhanced version of the same sort of probable cause showing that search warrants must. *See* 18 U.S.C. § 2518(1), (4). The disclosure of much of this information, including much of the probable cause statement presented in support of a wiretap application, would often serve significant public interests, especially if any information determined by the court to, on balance, not be disclosable is redacted. In addition, CIR has amply explained why privacy interests are of diminished concern in this case, further demonstrating how the district court erred in failing to order disclosure of any materials sought by CIR.

17

## CONCLUSION

Especially given the public interest in robust oversight of the federal government's exercise of its wiretap authority and the broader public interest in public access to and oversight of law enforcement and court proceedings, this Court should hold that whether there is "good cause" to unseal wiretap applications and orders under section 2518(8)(b) turns on a modified Rule 26(c) analysis, as FAC has proposed. Further, applying that standard, the district court's order should be reversed, and this Court should either order the records at issue unsealed or remand the case to the district court with instructions to apply the proper "good cause" standard.

Dated: June 4, 2025

Respectfully submitted,

FIRST AMENDMENT COALITION

By _____ */s/ Aaron Field* _____
DAVID LOY
AARON FIELD
Attorneys for Amicus Curiae FIRST
AMENDMENT COALITION

18

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5) and 32(g)(1), and Circuit Rule 29-2(c)(3), according to the word processing system used to prepare this brief, the word count is 4,265 words, not including the caption, tables, signature block, Corporate Disclosure Statement And Statement of Compliance, and this certificate.

Dated: June 4, 2025

FIRST AMENDMENT COALITION

By _____ */s/ Aaron Field* _____
DAVID LOY
AARON FIELD
Attorneys for Amicus Curiae FIRST
AMENDMENT COALITION

19